# In the United States Court of Federal Claims

|  |  |
|---|---|
| CS 321 EAST 2ND INVESTORS, LLC, | No. 25-cv-595 |
| Plaintiff, | Filed Under Seal: September 30, 2025 |
| v. | Publication: October 2, 2025[1] |
| THE UNITED STATES, | |
| Defendant. | |

*Gordon N. Griffin* of Holland & Knight LLP, Washington, D.C. argued for Plaintiff. With him on the briefs were *Hillary J. Freund* and *Richard Ariel* of Holland & Knight LLP, Washington, D.C.

*Nelson Kuan* of the United States Department of Justice, Civil Division, Washington, D.C. argued for Defendant. With him on the briefs were *Patricia M. McCarthy* and *Albert S. Iarossi*, of the United States Department of Justice, Civil Division, Washington, D.C., and *Marilyn M. Paik* of the Office of the General Counsel, United States General Services Administration.

## MEMORANDUM AND ORDER

Plaintiff CS 321 brings this pre-award protest challenging the Federal Public Defender's (FPD's) Office for the Central District of California's attempt, in coordination with the General Services Administration (GSA), to lease certain office space. FPD currently leases office space from CS 321 for one of its two locations. FPD, dissatisfied with its current office space, seeks to consolidate its two offices into one location and also seeks updated accommodations. Accordingly, GSA, acting on behalf of FPD, issued Request for Lease Proposal No. 2CA1644 (RLP).

---

[1] This Memorandum and Order was filed under seal on September 30, 2025, in accordance with the Protective Order entered in this case. ECF No. 8. On October 1, 2025, the parties filed a Joint Status Report proposing redactions to the Memorandum and Order. ECF No. 29. The sealed and public versions of this Memorandum and Order are identical, except for some redactions, this footnote, and the addition of the publication date.

The ideal lease, as laid out in the RLP, would house FPD in a single building and provide at least 57,558 useful square feet (USF) of office space.[2]  Such a requirement, however, would effectively lock CS 321 out of the competition, as its building is not large enough to meet that space requirement.

CS 321, reluctant to see its long-time tenant go, challenges the RLP.  It argues that the RLP's square footage requirements violate two Office of Management and Budget (OMB) memoranda and the Utilizing Space Efficiently and Improving Technologies Act (USE IT Act or Act), Pub. L. No. 118-272 § 2302, 138 Stat. 2992, 3219, all of which address the utilization of certain types of federal office space in the executive branch.[3]  CS 321 also argues that the RLP space requirements are unreasonable.  Defendant contests these arguments and asserts that CS 321 lacks both Article III standing and statutory standing under the Tucker Act.

While the Court holds that CS 321 possesses standing to lodge this protest, the Court also finds that the OMB Memos and the USE IT Act do not apply to this RLP as (i) these authorities are not procurement statutes, and (ii) these authorities govern tenants in the executive branch, not the judicial branch, of which FPD is part.  For the reasons stated below, the Court **DENIES** CS 321's Motion for Judgment on the Administrative Record (ECF No. 16) and **GRANTS IN PART AND DENIES IN PART** Defendant's Motion to Dismiss, or in the alternative Motion for Judgment on the Administrative Record (ECF No. 18).

---

[2] In commercial leasing, USF references the area within the tenant's premises that the tenant can exclusively occupy and use.  *See EREH Phase I LLC v. United States*, 95 Fed. Cl. 108, 117 n.10 (2010).

[3] The USE IT Act was enacted and signed into law as part of the Thomas R. Carper Water Resources Development Act of 2024, Pub. L. No. 118-272, 138 Stat. 2992.

<u>**BACKGROUND**</u>

**I.  Statutory and Regulatory Context**

This pre-award bid protest concerns, in pertinent part, one statute and two OMB memoranda. By various methods, these authorities ensure oversight of executive branch use of office space, providing limits around certain federal agencies' use of that space to increase cost-efficiency.

The first memorandum, issued on August 16, 2024, titled "Management Procedures Meomorandum [sic] No. 2024-01" (2024 Memo),[4] directed that "Federal agencies . . . implement sound real property management practices through their annual capital plans and optimize their office portfolios in order to efficiently achieve the agency's mission." *Id.* at 1.  The 2024 Memo contained three sections.  The first section concerned a maximum office space design standard and directed that newly acquired office space "must not be designed to exceed an office space design standard of 150 [USF] per person." *Id.* at 3.  Additionally, it set a minimum average annual occupancy target of 60 percent for office spaces exceeding 50,000 USF. *Id.*  The second section established a requirement for agencies to calculate occupancy metrics and the methodology to do so. *Id* at 4–5.  The third section set out a reporting and data-sharing requirement, directing agencies to report their occupancy statistics annually for each qualifying office space and to make the underlying data available to OMB, GSA, and the Federal Real Property Council upon request. *Id.* at 5–6.

On January 4, 2025, Congress enacted the USE IT Act.  The USE IT Act established specific statutory guidelines for monitoring and improving the utilization of federally-leased and publicly-owned office spaces.  It mandates agencies annually report their occupancy and utilization

---

[4] Office of Management and Budget, Management Procedures Memorandum No. 2024-01 (Aug. 16, 2024) https://bidenwhitehouse.archives.gov/wp-content/uploads/2024/08/MPM-2024-01-Implementation-of-Occupancy-Metrics-for-Office-Space.pdf.

rates for each publicly-owned building and federally-leased space, comparing "the capacity to the actual utilization rate based on a utilization benchmark of 150 usable square feet per person." *Id.* § 2302(c)(1). Further, the Act addresses the reduction of unneeded space, directing that "[n]ot later than 1 year after the date of enactment of this Act, and annually thereafter, the [OMB] Director, in consultation with the [GSA] Administrator, shall ensure building utilization in each public building and federally-leased space is not less than 60 percent." *Id.* § 2302(d)(1). If building utilization falls below "60 percent on average over a 1-year period," GSA is required to notify the tenant agency and relevant congressional committees of the excess capacity and costs. *Id.* § 2302(d)(2). Subsequent failure by an agency to meet the utilization target requires GSA, in consultation with OMB, to "take steps to reduce the space of the tenant agency, including consolidating the tenant agency with another agency, selling or disposing of excess capacity space, and adjusting space requirements." *Id.* § 2302(d)(3).

On April 21, 2025, OMB issued Memorandum M-25-25, titled "Implementation of the Utilizing Space Efficiently and Improving Technologies Act" (2025 Memo). [5] The 2025 Memo rescinded the First OMB Memo and implemented an expedited timeline for federal agencies to comply with the USE IT Act; the 2025 Memo's relevant provisions, however, remain mostly the same as the 2024 Memo.

## II.    Pre-Request for Lease Proposal (RLP) History

Since 1999, FPD has operated out of Plaintiff CS 321's building at 321 E. 2nd Street, Los Angeles, California (321 E. 2nd Location). AR at 1264. FPD is the sole tenant, occupying all ten floors of the building. AR at 1358. The 321 E. 2nd Location consists of 50,130 USF or 54,827

---

[5] Office of Management and Budget, M-25-25 (April 21, 2025) https://www.whitehouse.gov/wp-content/uploads/2025/02/M-25-25-Implementation-of-the-Utilizing-Space-Efficiently-and-Improving-Technologies-Act.pdf.

Rentable Square Feet (RSF) of space.[6]  AR at 5.  FPD has renewed its lease multiple times, with the current lease expiring on December 31, 2026.  *Id.*  To accommodate FPD's growth, GSA leased additional space across the street from the 321 E. 2nd Location, at 200 South San Pedro Street, Los Angeles, California, 90012 (San Pedro Location).  *Id.*  Fifty-three FPD employees occupy nearly three floors of the San Pedro Location, which consists of 16,851 USF or 18,121 RSF.  *Id.*; AR at 1358.  These two leases provide FPD with a combined total of 66,981 USF.[7]  The San Pedro Location houses FPD's Capital Habeas Unit (CHU) while the 321 E. 2nd Location houses the rest of FPD, known as the "traditional unit."  AR at 5, 1278

FPD contends that its current leasing arrangement is less than ideal.  AR at 1358; AR at 882.  Specifically, FPD states that the 321 E. 2nd Location has not undergone any major renovations or rehabilitations since 1992, and further reports having "endured significant challenges" during its tenancy.  AR at 882.  According to FPD, these challenges include "elevators that frequently are not operable," water leakage during rain, and inadequate heating, ventilation, and air conditioning.  AR at 502, 1268.  Additionally, FPD contends that splitting staff across two buildings inhibits effective operations and management.  AR at 1277–78.  Thus, FPD was looking for a change.

The leases for FPD's locations are set to expire in 2026 and 2027.  AR at 5.  In the summer of 2022, on behalf of FPD, the Ninth Circuit Office of the Circuit Executive's Space and Facilities

---

[6]  RSF includes the USF plus a pro rata share of common areas, such as lobbies, hallways, and restrooms, and is the basis for calculating rent.  *See EREH Phase I LLC*, 95 Fed. Cl. at 117 n.10. The RLP uses the term "American National Standards Institute/Building Owners and Managers Association (ANSI/BOMA) Occupant Area" (ABOA) square feet.  ABOA is equivalent to USF. *Compare* AR at 274, *with* AR at 988.  For purposes of this opinion, the court uses the term USF.

[7]  FPD leases an additional, third location for warehouse and storage space.  AR at 333.  FPD does not seek to combine this storage space with its office space.  *Id.*

Unit (Space and Facilities Unit) began coordinating with GSA to find a new building that could meet FPD's current and future needs. AR at 4. Initially, FPD sought an increase in the amount of space it would acquire—from 66,981 USF to 69,246 USF. AR at 4. However, that desired increase in square footage created issues—more space meant greater expenses. *See* AR at 50, 186, 298. By February 2023, in coordination with the Space and Facilities Unit and GSA, FPD agreed to reduce the amount of space it sought from its initial estimates. *See* AR at 191, 198, 345. Specifically, FPD now sought a single building consisting of 57,558 USF. AR at 274, 354. Notably, that is approximately 15 percent less than the 66,981 USF of office space, split between locations, that FPD currently occupies; however, it is more than the 49,584 USF that the 321 E. 2nd Location alone can accommodate.[8] AR at 1144. Accordingly, in April 2023, GSA was prepared to place the project "into an active status" and move towards a competitive procurement. AR at 505, 445.

### III. The Request for Lease Proposal

On October 22, 2024, GSA issued the RLP to secure leased space for FPD's office in Los Angeles, California for "15 Years, 15 Years Firm."[9] AR at 988. The Lease was to be awarded to the lowest priced, technically acceptable offer submitted. AR at 1004. The RLP contained two relevant requirements, the first of which relates to building quality:

> The Space shall be located in a modern quality Building of sound and substantial construction with a facade of stone, marble, brick, stainless steel, aluminum or other

---

[8] In developing the requirement, FPD accounted for both its current staffing of 189 employees and its 15-year projected staffing of 201 employees. At 189 employees, FPD's requested square footage works out to be 293 USF per employee; at the projected 201 employees, the amount of space would be roughly 286 USF per employee. AR at 485–86.

[9] This phrase means that the lease will last 15 years, and that the Government will generally not have the right to terminate for any of those 15 years. *See* GSA Leasing Desk Guide, Appendix A at A-8, https://www.gsa.gov/cdnstatic/LDG-Appendix-A_Terminology-508c-sm.pdf. The term "firm" may also constitute less than the entire lease term. For example, after the initial lease term in this RLP, the options held by the Government last "for a period of 5 years, 4 years firm." AR 988.

permanent materials in good condition and acceptable to the [Lease Contracting Officer]. If not a new Building, the Space offered shall be in a Building that has undergone, or will complete by occupancy, modernization or adaptive reuse for the Space with modern conveniences.

AR at 988.

To that end, the RLP also required offerors to include "[t]he architectural plans for modernization, if the offered Building is not a modern office Building" and a construction schedule. AR at 1001. The second requirement concerns square footage; the RLP reflects that GSA seeks to lease space with a minimum of 57,558 USF and maximum of 60,435 USF. *Id.* The RLP included an exhibit specifying the overall square footage sought and breaking it down by type of space.[10] *See* AR 1054–56. It listed the number and size of offices required for each category of staff, as well as the support areas to be provided, such as conference rooms and a mail room, with the square footage designated for each. AR at 1054–56. Proposals for the RLP were due by December 6, 2024. AR at 999. GSA received ██ initial offers, including CS 321's proposal. AR at 1268.

## IV.    Notice of Deficiency and CS 321's Proposal

On October 22, 2024, the same day GSA issued the RLP, GSA sent CS 321 a letter stating that it did not believe that the 321 E. 2nd Location could meet the RLP's requirements. AR at 1328–29. The letter stated two reasons for GSA's determination. As an initial matter, in GSA's view, the existing square footage of the 321 E. 2nd Location (i) was presently inadequate to meet the minimum square footage requirement, and (ii) any proposed expansion to meet the required footage did not seem financially plausible, presenting a significant performance risk. *Id.* Second, regarding the quality of the building, the letter stated:

---

[10] This exhibit contains identical space requirements to those reflected in a chart labeled "Federal Defender Work Chart for Space Needs" that FPD had created in February 2023. AR at 368; *see also* AR at 485.

> [T]he existing space would need significant renovation to meet the minimum re-
> quirements.  Expansion and complete renovation of the building could not be per-
> formed without unreasonable disruption of the Agency's mission and operations.
> Swing space would have to be provided within the building to avoid operational
> disruption Agency.  The Government is the sole occupant in the building and there
> is no additional space within the building available to provide for swing space.

*Id.*  The letter also informed CS 321 that its proposal should address the concerns detailed in the

October 22 letter.  *Id.*

On December 6, 2024, CS 321 submitted its proposal.  CS 321 offered to modernize the

321 E. 2nd Location, stating that "[a]s part of the lease proposal, offeror will perform a complete

building shell modernization, including: roof replacement, elevator modernization, new HVAC,

new fire panel, and new pipes."  AR at 1147.  CS 321's modernization plan brought its proposal

closer to meeting the requirements of the RLP.  But with respect to the space, CS 321 could only

offer to lease 49,584 USF, as that is the maximum capacity of the 321 E. 2nd Location.  AR at

1144.

## V.    The GAO Protest

On December 6, 2024, the same day it submitted its proposal, CS 321 filed a protest at the

GAO.  *CS 321 E. 2nd Invs., LLC*, B-423215, 2025 CPD ¶ 69, 2025 WL 798776 at *3 (Mar. 10,

2025).  CS 321 lodged two distinct claims in its GAO protest.  First, CS 321 challenged specific

requirements of the RLP, including line items comprising the total requested square footage, the

need for certain spaces, and even conference room sizes.  AR at 1294–95.  In response, the con-

tracting officer submitted a declaration to the GAO, providing the reasoning behind certain deci-

sions that had been made.  AR at 1264–69.  Second, CS 321 argued that the RLP ran afoul of the

USE IT Act.  AR at 1379 (citing Pub. L. No. 118-272, 138 Stat. 2992).  According to CS 321, the

USE IT Act limited FPD to leasing 150 USF per person, or 30,150 total USF based on FPD's

projected figure of 201 personnel in the space.  *Id.*

On March 10, 2025, the GAO rejected CS 321's protest.  *CS 321*, 2025 WL 798776.  The GAO addressed the issue of the required space, finding that FPD's planning was reasonable.  *Id* at *3–4.  Additionally, the GAO rejected CS 321's argument related to the USE IT Act.  The GAO found that the Act was inapplicable because it did not apply retroactively and was enacted after the RLP had been issued and proposals were due.  *Id.* at *6.  The GAO also noted that the USE IT Act applies only to executive agencies covered by the Chief Financial Officers Act—not to FPD, which is part of the judiciary—and thus imposes no binding constraints on this lease.  *Id.*  Accordingly, the GAO denied CS 321's protest.  *CS 321*, 2025 WL 798776.

On March 13, 2025, after receipt of the GAO's decision, GSA sent CS 321 a second letter, outlining the same deficiencies it had previously identified in CS 321's proposal.  ECF No. 15, Ex. G.  Specifically, GSA noted 20 deficiencies, including that CS 321 had provided no plans or material specification for any of the proposed modernization work.  *Id* at 3.[11]  GSA required CS 321 to produce the noted information by April 4, 2025.  ECF No. 15, Ex. H.  After filing the present bid protest, CS 321 timely submitted its proposal revision to GSA.  *Id.*  GSA has not yet awarded the lease to any offeror.

## VI.    Procedural History

CS 321 filed its Complaint in this action on April 4, 2024, three weeks after the GAO's denial of its protest.  ECF No. 1.  Pursuant to this Court's Scheduling Order, on May 23, 2025, CS 321 filed its Amended Complaint and its Motion for Judgment on the Administrative Record (MJAR).  ECF No. 13 (Scheduling Order); ECF No. 15 (Am. Compl.); ECF No. 16 (Pl. MJAR).  On June 23, 2025, Defendant filed a Motion to Dismiss and its responsive MJAR.  ECF No. 18

---

[11] Citations throughout this Memorandum and Order correspond to the ECF-assigned page numbers, which do not always correspond to the pagination within the document.

(Def. MJAR).  CS 321 filed its Response on July 7, 2025, and Defendant filed its Reply on July 21, 2025.  ECF No. 20 (Pl. Resp.); ECF No 22 (Def. Reply).  The Court held oral argument on August 6, 2025.  Minute Order, dated Aug. 6, 2025.

## APPLICABLE LEGAL STANDARDS

Pursuant to 28 U.S.C. § 1491(b), the United States Court of Federal Claims has jurisdiction over pre-award bid protests.  *See* 28 U.S.C. § 1491(b).  Specifically, 1491(b)(1) grants the Court jurisdiction over protests filed "by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract . . . or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement . . . without regard to whether suit is instituted before or after the contract is awarded."  *See* 28 U.S.C. § 1491(b)(1).  An interested party is "an actual or prospective bidder or offeror whose direct economic interest would be affected by the award of the contract or by failure to award the contract."  *Percipient.AI v. United States*, No. 23-1970, 2025 WL 2472671, at *12 (Fed. Cir. Aug. 28, 2025) (en banc); *see also CGI Fed. Inc. v. United States*, 779 F.3d 1346, 1348 (Fed. Cir. 2015).

This Court reviews bid protests in two steps.  First, the Court analyzes the procurement under the Administrative Procedure Act (APA) standard to determine whether the Agency "acted without rational basis or contrary to law when evaluating the bids and awarding the contract."  *Bannum, Inc. v. United States*, 404 F.3d 1346, 1351 (Fed. Cir. 2005); 28 U.S.C. § 1491(b)(4) ("In any action under this subsection, the courts shall review the agency's decision pursuant to the standards set forth in section 706 of title 5."); *see Oak Grove Techs., LLC v. United States*, 116 F.4th 1364, 1374 (Fed. Cir. 2024).  Second, the Court considers whether the alleged errors prejudiced the protestor.  *DynCorp Int'l, LLC v. United States*, 10 F.4th 1300, 1308 (Fed. Cir. 2021) (citing *Bannum*, 404 F.3d at 1351).

At the first step, the APA requires a reviewing court to determine whether an agency's action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *see Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 284 (1974). When a disappointed bidder alleges a violation of regulation or procedure, the Court reviews whether there was "a clear and prejudicial violation of applicable statutes or regulations." *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1333 (Fed. Cir. 2001) (quoting *Kentron Hawaii, Ltd. v. Warner*, 480 F.2d 1166, 1169 (D.C. Cir. 1973)). When a bidder alleges that the procurement official's decision lacked a rational basis, the Court reviews "whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion." *Dell Fed. Sys., L.P. v. United States,* 906 F.3d 982, 992 (Fed. Cir. 2018) *(*quoting *Banknote Corp. of Am., Inc. v. United States*, 365 F.3d 1345, 1351 (Fed. Cir. 2004)*)*.

At step two, this Court evaluates the factual question of prejudice. *Sys. Stud. & Simulation, Inc. v. United States*, 22 F.4th 994, 998 (Fed. Cir. 2021) (citing *WellPoint Mil. Care Corp. v. United States*, 953 F.3d 1373, 1377 (Fed. Cir. 2020)). A protestor establishes prejudice by showing "that there was a 'substantial chance' it would have received the contract award but for that error." *Sys. Stud. & Simulation*, 22 F.4th at 998 (quoting *Bannum*, 404 F.3d at 1353). In pre-award protests, however, "it is difficult, if not impossible, to establish a substantial chance of winning the contract prior to the submission of any bids." *Orion Tech., Inc. v. United States*, 704 F.3d 1344, 1348 (Fed. Cir. 2013) (citing *Weeks Marine, Inc. v. United States*, 575 F.3d 1352, 1361 (Fed. Cir. 2009)). Accordingly, the Federal Circuit has recognized that in the pre-award bid protest context, a different statutory standing test often applies. Specifically, the Federal Circuit directs that the appropriate inquiry is whether the agency's conduct resulted in a "non-trivial competitive injury." *Weeks Marine*, 575 F.3d at 1362. However, the Circuit further notes that even in pre-award

protests, where there is "an adequate factual predicate" to apply the test, courts should still apply the "substantial chance" standard. *Oracle Am., Inc. v. United States*, 975 F.3d 1279, 1292 n.3 (Fed. Cir. 2020).

When deciding a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1), the court must accept as true all undisputed facts asserted in the complaint and draw reasonable inferences in favor of the plaintiff. *Acevedo v. United States*, 824 F.3d 1365, 1368 (Fed. Cir. 2016). The plaintiff "bears the burden of establishing the court's jurisdiction over its claims by a preponderance of the evidence." *Trusted Integration, Inc. v. United States*, 659 F.3d 1159, 1163 (Fed. Cir. 2011). The court is not limited to the pleadings to assure itself of its jurisdiction; it may "inquire into jurisdictional facts" to confirm jurisdiction. *Rocovich v. United States*, 933 F.2d 991, 993 (Fed. Cir. 1991).

When considering a motion to dismiss under Rule 12(b)(6), the Court must "take as true all undisputed facts alleged in the complaint and draw all reasonable inferences based on those allegations." *Vasko v. United States*, 581 F. App'x 894, 897 (Fed. Cir. 2014) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007)). To withstand dismissal under Rule 12(b)(6), a complaint "must allege facts 'plausibly suggesting (not merely consistent with)' a showing of entitlement to relief." *Acceptance Ins. Cos., Inc. v. United States*, 583 F.3d 849, 853 (Fed. Cir. 2009) (quoting *Twombly*, 550 U.S. at 557). Put differently, the plaintiff's "[f]actual allegations must be enough to raise a right of relief above the speculative level." *Twombly*, 550 U.S. at 545 (requiring "enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of [the plaintiff's claim]"). Dismissal for failure to state a claim upon which relief can be granted under Rule 12(b)(6) "is appropriate when the facts asserted by the claimant do not entitle him to a legal remedy." *Lindsay v. United States*, 295 F.3d 1252, 1257 (Fed. Cir. 2002); *Welty v. United States*, 926

F.3d 1319, 1323 (Fed. Cir. 2019); *CeleraPro, LLC v. United States*, 168 Fed. Cl. 408, 419–20 (2023).

In the Court of Federal Claims, the merits of bid protests are adjudicated under Rule 52.1(c), which provides an expedited trial on a "paper record, allowing fact-finding by the trial court." Rule 52.1(c) of the Rules of the United States Court of Federal Claims (Rule(s)); *Bannum*, 404 F.3d at 1356 (referencing Rule 56.1, which was replaced by Rule 52.1(c)). Unlike at summary judgment, genuine disputes of material fact do not preclude the Court from granting a motion for judgment on the administrative record. *Bannum*, 404 F.3d at 1357. This Court is empowered to provide any relief, including declaratory or injunctive relief, that it deems proper. 28 U.S.C. § 1491(b)(2); *Oak Grove*, 116 F.4th at 1375.


## <u>DISCUSSION</u>

CS 321 brings a pre-award challenge to the RLP, arguing that the RLP's minimum square footage requirement is arbitrary, capricious, and contrary to law. Am. Compl. at 4. To support its challenge, CS 321 advances two lines of argument. First, it contends that statutory and regulatory authorities limit the amount of office space FPD can procure to 150 USF per person, so the RLP's minimum square footage requirement of almost double that amount is unlawful. *Id*. Second, CS 321 argues that the minimum square footage requirement does not reflect FPD's actual requirements and is therefore unduly restrictive. *Id*. Defendant, for its part, argues that CS 321 lacks both Article III and statutory standing. Def. MJAR at 9–20. As discussed below, the Court holds that while CS 321 can establish both Article III standing and statutory standing, the RLP's minimum square footage requirement is not arbitrary and capricious or contrary to law; accordingly, CS 321's protest fails.

## I.    Standing

Defendant alleges that CS 321 lacks both Article III and statutory standing under the Tucker Act.  Def. MJAR at 16–22.  Both arguments center primarily on the premise that CS 321's building cannot receive the lease award because it fails to satisfy other, unchallenged requirements of the RLP.  *Compare* Def. MJAR at 20–22, *and* Def. Reply at 8–9, *with* Def. MJAR at 18–19, *and* Def Reply at 9–11.  The Court addresses this overlapping contention once, in the context of statutory standing, because the Tucker Act "imposes more stringent standing requirements than Article III."  *Associated Energy Grp., LLC v. United States*, 131 F.4th 1312, 1319 (Fed. Cir. 2025) (quoting *Weeks Marine*, 575 F.3d at 1359).  Having concluded that CS 321 satisfies the Tucker Act's standard, the Court need not repeat the same analysis under Article III.  *See id.*  The Court does, however, separately consider those Article III arguments advanced by Defendant that do not overlap with its statutory standing challenge.

### A.    Article III Standing

Article III standing is a threshold jurisdictional question in the United States Court of Federal Claims.  *Associated Energy Grp.*, 131 F.4th at 1318 (Fed. Cir. 2025).  "The party invoking federal jurisdiction bears the burden of establishing the elements of standing."  *CliniComp Int'l, Inc. v. United States*, 904 F.3d 1353, 1358 (Fed. Cir. 2018).  "Article III standing requires that a plaintiff have: '(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision.'" *Associated Energy Grp.*, 131 F.4th at 1318 (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016)); *see also TransUnion LLC v. Ramirez*, 594 U.S. 413, 423, (2021) ("If 'the plaintiff does not claim to have suffered an injury that the defendant caused and the court can remedy, there is no case or controversy for the federal court to resolve.'" (quoting *Casillas v. Madison Ave. Assocs., Inc*., 926

14

F.3d 329, 333 (7th Cir. 2019))).

Defendant argues that CS 321 has not shown an injury in fact because it has not alleged the invasion of any legally protected interest.[12]  According to Defendant, CS 321 was not barred from competing and, in fact, submitted a proposal in this procurement; thus, any claim that it was denied the opportunity to compete is conclusory.  However, Defendant's theory reduces Article III standing to a paperwork test: because CS 321 managed to file a proposal, it suffered no injury.  That is not the law.  In the competitive-bidding context, there is injury in fact when "a prospective bidder alleges that it would be unlawfully *disadvantaged in competing* for a government contract that the bidder is 'very likely' to bid on in the 'relatively near future.'"  *Acetris Health, LLC v. United States*, 949 F.3d 719, 727 (Fed. Cir. 2020) (quoting *Adarand Constructors, Inc. v. Peña*, 515 U.S. 200, 211–12, (1995)) (emphasis added).  Here, the challenged minimum square footage term operates as just such a disadvantage: so long as it remains, CS 321's proposal cannot prevail.  That barrier CS 321 faces is an "invasion of a legally protected interest" that is "concrete and particularized" and "actual or imminent."  *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016).  Indeed, accepting Defendant's position would manufacture a catch-22 in which offerors must decline to bid to preserve standing to challenge potentially unlawful terms, but by doing so risk forfeiting any chance at award if their protest fails.  Article III imposes no such trap.  The RLP's square footage requirement forecloses CS 321 from meaningful consideration because its building offers 7,458 USF less than the requirement; this is sufficient for Plaintiff to demonstrate a concrete

---

[12] Defendant also argues that CS 321 has failed to show causation and redressability.  Def. MJAR at 18–19.  In the present case, both arguments are essentially the same: because CS 321's building fails other, unchallenged RLP requirements which would independently disqualify it from consideration, it cannot prevail in the competition.  *Id.*  However, as explained above, as this is the same argument pressed under the Defendant's Tucker Act's statutory standing argument—which contains a more stringent standard and was the focus of the parties' briefing—the Court addresses it in that context.

competitive injury. Am. Compl. at 4; AR at 1054–56; *see CGI Fed. Inc. v. United States*, 779 F.3d

1346, 1351 (Fed. Cir. 2015) (finding Article III standing when prospective bidder protested rather

than bid due to illegal payment terms); *see also BCG Fed. Corp. v. United States*, 172 Fed. Cl.

543, 552 (2024) (finding Article III standing when allegedly unlawful requirements effectively

eliminated protester from competition).

Having dispensed with the Article III-specific standing challenges, the Court now consid-

ers the overlapping standing challenges under the more restrictive statutory standing analysis pur-

suant to the Tucker Act.

### B.    Statutory Standing

Defendant also contends that CS 321 lacks statutory standing under 28 U.S.C. §1491(b)(1).

Def. MJAR at 20–22. The parties' dispute over statutory standing turns on the proper statutory

standing standard and its application to this case. Defendant contends that CS 321 cannot establish

statutory standing because its failure to satisfy the RLP's minimum square footage requirement

was only one of several deficiencies in its proposal, such that even absent the requirement CS 321

would lack a substantial chance of award and would thus fail to meet the Tucker Act standard. *Id.*;

Def. Reply at 9–12. CS 321 disagrees, maintaining that the square footage requirement is the only

meaningful obstacle to its eligibility and that, absent this unlawful term, it would be well-posi-

tioned to compete for the lease. Pl. Resp. 10–13. The parties further dispute whether the Court

should apply the "substantial chance" test or the "non-trivial competitive injury" standard. Pl.

Resp. at 12 n.3; Def. Reply at 9–10. Each side insists it prevails under either formulation. The

Court begins, therefore, by determining which standard governs here.

### 1.    The Non-Trivial Competitive Injury Standard Applies.

To establish statutory standing under 28 U.S.C. § 1491(b)(1), a plaintiff must be an "interested party" and must show prejudice.  *Associated Energy Grp.,* 131 F.4th at 1319; *CliniComp Int'l*, 904 F.3d at 1358.  An interested party is an actual or prospective bidder with a direct economic interest—ordinarily shown by demonstrating a substantial chance of award but for the alleged error.  *Diaz v. United States*, 853 F.3d 1355, 1358 (Fed. Cir. 2017); *REV, LLC v. United States*, 91 F.4th 1156, 1163 (Fed. Cir. 2024).

The default measure of prejudice in post-award protests is the "substantial chance" test. *Info. Tech. & Applications Corp. v. United States*, 316 F.3d 1312, 1319 (Fed. Cir. 2003).  In pre-award cases without an evaluative record, however, the Federal Circuit applies the more permissive "non-trivial competitive injury" test, recognizing that it may be nearly impossible to prove a substantial chance of award before proposals are assessed.  *Weeks Marine*, 575 F.3d at 1361–62 (applying non-trivial competitive injury test because record in pre-award protest contained "no factual foundation for a 'but for' prejudice analysis"); *Zolon PCS II, LLC v. United States*, 172 Fed. Cl. 742, 758–60 (2024) (applying non-trivial competitive injury test when agency had not assessed all offerors because record was insufficient to establish substantial chance).  Under Federal Circuit precedent, the dividing line appears to be whether the record allows a meaningful prejudice analysis.  When proposals have been submitted or evaluations prepared, the substantial chance test governs; otherwise, courts apply the non-trivial competitive injury standard.  *Orion Tech., Inc. v. United States*, 704 F.3d 1344, 1348–49 (Fed. Cir. 2013) (applying substantial chance standard because agency's evaluation provided "adequate factual predicate" to determine prejudice); *Oracle Am., Inc. v. United States*, 975 F.3d 1279, 1291 n.3 (Fed. Cir. 2020) (applying substantial chance standard to pre-award protest because record contained sufficient evidence that protester would have lost competition, even if alleged procurement error had not occurred).

Based on the facts of the present case, the "non-trivial competitive injury" standard applies here. Although CS 321's proposal is in the record, no competing proposals or evaluations are available. Without such evaluations, the Plaintiff could not support the "'but for' prejudice analysis" that the substantial chance analysis applies. *See Weeks Marine*, 575 F.3d at 1361. Indeed, the present posture mirrors the facts of *Weeks Marine*, where the Federal Circuit deemed the record unripe for a substantial chance inquiry, as opposed to the facts of *Orion*, where the agency had already evaluated the protestor's submission. 575 F.3d at 1361–62; 704 F.3d at 1348–49.

## 2.    CS 321 Has Alleged a Non-Trivial Competitive Injury.

Defendant contends that CS 321 cannot demonstrate a non-trivial competitive injury because its proposal was purportedly riddled with independent deficiencies, most notably the absence of plans or a feasible schedule for required modernization. Def. Reply at 10–13. In Defendant's view, the square footage requirement is beside the point: CS 321 would remain ineligible regardless due to these insufficiencies. Def. MJAR at 19. CS 321 responds that the square footage term alone forecloses its ability to compete and that the other cited deficiencies are either clerical or derivative of the excessive space requirement. Pl. Resp. at 12–13. It further contends that reducing the requirement, to what it believes are appropriate levels, would allow modernization using existing space as swing space, and that in any event, such issues could be addressed during the proposal process. *Id.*

Defendant's theory asks the Court to make, in the first instance, factual and discretionary judgments that procurement law assigns to the contracting officer—something the Federal Circuit cautioned against in *CACI, Inc.-Federal v. United States*. *See* 67 F.4th 1145, 1152–54 (Fed. Cir. 2023). There, the Court of Federal Claims dismissed a bid protest for lack of statutory standing after finding *de novo*, on a litigation-built record, that the protestor had an organizational conflict

18

of interest, when the contracting officer had never addressed the issue. *Id.* The Federal Circuit rejected that approach, explaining that when statutory-standing and merits questions overlap, a trial court may not resolve bidder-qualification issues by making its own first-instance factual findings or exercising discretion reserved to the agency. *Id.* at 1153-54. Absent an applicable *Chenery* exception (e.g., a purely legal issue), such matters must be decided by the contracting officer and then reviewed on the administrative record under APA standards. *Id.* at 1152–54 (referencing *SEC v. Chenery Corp.*, 318 U.S. 80 (1943)). *CACI* does not prohibit a trial court from determining there was no prejudice when the violation of a requirement was clear and incurable as a matter of law, making the outcome "foreordained." *Independent Rough Terrain Center, LLC v. United States*, 172 Fed. Cl. 250, 262 n.6 (2024) (quoting *Oracle*, 975 F.3d at 1291).

Applied here, whether CS 321's proposal satisfies the RLP's modernization requirement is the kind of evaluative determination reserved in the first instance for the contracting officer. The agency's deficiency correspondence identified concerns with feasibility, swing space, phasing, and schedule detail, and requested further information; the correspondence did not deem the offer unawardable for noncompliance. *See* ECF No. 15., Ex. G. Instead, it offered CS 321 the opportunity to provide the requisite information and correct deficiencies. *Id.* Thus, the administrative record does not contain a judgment by the agency stating that CS 321's final proposal is incapable of meeting those modernization requirements. The administrative record also contains CS 321's proposal-level commitment to "perform a complete building-shell modernization," including roof replacement, elevator modernization, new HVAC, a new fire panel, and new piping. AR at 1147. On this record, and particularly given that final proposal revisions had not yet been requested, the Court cannot conclude that it would be impossible for the contracting officer to find the proposal compliant after clarifications or revisions on modernization. It remains at least possible—however

unlikely it may appear to some at this juncture—that CS 321 could propose a credible phasing approach, obtain swing space through negotiation, or otherwise structure construction to complete modernization by occupancy. Thus, as *CACI* requires more than probable deficiencies to find that a protestor lacks statutory standing, this Court cannot state on the present record that CS 321 lacks statutory standing. *See CACI*, 67 F.4th at 1154; *Oracle*, 975 F.3d at 1291.

The Court acknowledges that this is a close question. And while it is questionable whether CS 321 will ultimately be able to demonstrate a viable modernization path given the requirement that modernization be complete by lease commencement, such skepticism is of no moment. Indeed, it is for the contracting officer, in the first instance, to determine whether the proposal meets the solicitation's material modernization requirements. *See Office Design Grp. v. United States*, 951 F.3d 1366, 1371 (deferring to contracting officer's evaluation if supported by rational basis and not violative of procurement rules). Here, CS 321's proposal says it will do so, and nothing in the current record forecloses the agency from reaching that conclusion after proposal revisions.

## II.     CS 321's Argument That the RLP Violates Both the USE IT Act and the OMB Memos Fails.

CS 321 contends that two OMB memos[13] and the USE IT Act govern this acquisition and render the RLP's minimum square footage term unlawful. Am. Compl. at 3–4. In its view, the memos prohibit FPD from acquiring office space that exceeds a design standard of 150 USF per person, and the USE IT Act requires all federally-leased spaces to maintain a utilization rate of at

---

[13] CS 321 asserts that the OMB memos are entitled to the force and effect of law. Pl. MJAR at 18–23. It runs through various prongs of the *Hamlet* test to establish this position. *Id.* (citing *Hamlet v. United States*, 63 F.3d 1097, 1105 (Fed. Cir. 1995)). Defendant does not contest that the OMB memos are entitled to the force and effect of law. Further, CS 321 argues in its MJAR none of the exceptions listed in the memos apply here. *Id.* at 24–26. Defendant does not contest that any exception applies.

least 60 percent, calculated using the same 150 USF benchmark.[14]  *Id*. at 4.  Applied to this solicitation, CS 321 argues, the RLP's requirement of at least 57,558 USF for an office of no more than 201 personnel yields roughly 286 USF per person—nearly double the 150-USF standard.  *Id*. at 21.  If the RLP were limited to the lawful cap, CS 321 says, the requirement would be no more than 30,150 USF, which its approximately 50,000 USF building could accommodate.  *Id*.  Defendant responds that these authorities are not enforceable in a bid protest because such authorities are not procurement statutes or regulations, and that in any event the RLP does not violate them.  The Court agrees with Defendant.

### A.    The USE IT Act and the OMB Memos Are Not Procurement Authorities.

The Tucker Act provides jurisdiction only for violations of a statute or regulation "in connection with a procurement."  28 U.S.C. § 1491(b)(1).  As the Federal Circuit held in *Cleveland Assets, LLC v. United States*, this means the provision at issue must regulate the procurement process itself.  883 F.3d 1378, 1381–82 (Fed. Cir. 2018).  It is not enough for a plaintiff to allege a violation of any statute or regulation that may "tangentially" impact a procurement; the violation must stem from a law that regulates procurement activity.  *Id.* at 1381.  Additionally, it is not enough that a law has some effect on procurement or that it constrains agency discretion at a high level.  Were the rule otherwise, "§ 1491(b)(1) jurisdiction risks expanding far beyond the procurement context."  *Id.*

Defendant asserts that neither the USE IT Act nor the OMB memos are procurement authorities, as contemplated by the Tucker Act.  *See* Def. MJAR at 22; Def. Reply at 14 n.5.  In a brief footnote, CS 321 disagrees, claiming USE IT Act and the OMB memos expressly speak to

---

[14] For example, suppose a federal office space has 15,000 USF.  Its capacity is 100 people (15,000 USF/150 USF per person).  If only 60 people work in person, the building utilization, which compares the actual occupancy against the capacity, is 60 percent.

acquisition and federally-leased space.  *See* Pl. Resp. at 14 n.9.  A review of *Cleveland Assets* helps illustrate the distinction.  There, the protestor challenged a lease solicitation under 40 U.S.C. § 3307, which requires agencies to secure congressional approval before entering into leases above a certain cost.  *Cleveland Assets*, 883 F.3d at 1381.  Although section 3307 plainly affected lease terms by capping the rent the Government could pay, the Federal Circuit held that the statute did not regulate the procurement process.  *Id.*  Instead, the Circuit found that section 3307 was an appropriations statute, governing internal agency funding and project approval.  *Id*.  Indeed, in coming to its decision, the Circuit noted that section 3307 did not prescribe how GSA must structure solicitations, evaluate offers, or make awards.  *Id.*  The Circuit further stressed that even though section 3307 and its surrounding chapter contained provisions addressing "limitations on leasing certain types of spaces," and "requirements for construction, alteration, and lease of government buildings, such as ensuring compliance with building codes," these limitations were directed to Congress's control of appropriations and GSA's authority to act, not to the conduct of procurement itself.  *Id.* at 1382.

That reasoning controls here.  As described further below, under applicable law, neither the USE IT Act nor the OMB memos are procurement authorities.

### 1.    The USE IT Act

The USE IT Act requires agencies to measure and report utilization, establishes a benchmark of 150 USF per person, and directs OMB and GSA to ensure that federal agencies achieve at least 60 percent utilization in any federally-leased space. Pub. L. 118-272 § 2302(b)–(d).  If an agency falls short, the Act authorizes corrective action by OMB and GSA, such as consolidation or disposal of excess space.  *Id.* § 2302(d).  These provisions, like section 3307 in *Cleveland Assets*, function at the level of internal management.  *See Cleveland Assets*, 883 F.3d at 1381–82

("The structure of 40 U.S.C. § 3307 directs GSA how to apply for an appropriation, but it says nothing of how GSA must run its procurement once the appropriation is made."). They tell agencies what targets to meet and what reports to submit; they do not dictate how solicitations must be drafted, what evaluation factors apply, or when an award may be made. *See* Pub. L. 118-272 § 2302(d)(1) (defining occupancy targets), (c)(1) (directing reports that agencies must submit). The distinction between procurement rules and portfolio-management directives was dispositive in *Cleveland Assets*, and it is dispositive here as well.

CS 321 singles out a phrase from the USE IT Act to claim that it is a procurement statute. Pl. Resp. at 14 n.5. Specifically, CS 321 points to language in the Act's definition section stating that the Act applies to "federally-leased space." Pub. L. 118-272 § 2302(a). However, language of that sort, alone, is not determinative to convert the Act into a procurement statute; the Court must examine the statute as a whole. Indeed, the Federal Circuit's analysis of the relevant statute in *Cleveland Assets* is instructive in this regard. In that case, section 3307 of the relevant statute explicitly referenced "any building . . . under lease by the Federal Government." 40 U.S.C. § 3307(a)(3). Nevertheless, the Federal Circuit squarely held that the statute was not a procurement statute. *Cleveland Assets*, 883 F.3d at 1381. The operative question is not whether a statute mentions leased or acquired space, but whether, when looking at the statute as a whole, it prescribes a certain procurement process. *See Cleveland Assets*, 883 F.3d at 1381 (considering "statutory structure" to determine whether a statute regulates procurement).[15] When examining the USE IT Act, the answer is no. The Act does not prescribe solicitation procedures or award decision criteria; instead, it speaks to utilization benchmarks of operating government facilities and internal

---

[15] At oral argument, the Court asked both parties to identify any authorities, other than *Cleveland Assets*, on which courts rely when reviewing "what is or what is not a procurement law." Transcript, dated August 6, 2025 (ECF No. 26) at 54:13–14. Both parties identified only *Cleveland Assets* and cited no other cases. *Id* at 54:22–23, 56:11–12.

oversight mechanisms to achieve that broad goal.  In *Cleveland Assets*, in examining the relevant statute and finding "none of the surrounding statutory sections dictate[d] GSA's procurement procedures," the Federal Circuit concluded there was no procurement statute.  *Id* at 1382.  In turn, for the reasons noted above, the Court must also conclude here that the USE IT Act is not a procurement statute.

### 2.    The OMB Memos

The OMB memoranda function in the same way as the USE IT Act.  They set a utilization benchmark of 150 USF per person, require agencies to measure and report utilization, and provide methodologies for doing so.  *See* 2025 Memo at 4; 2024 Memo at 4–5.  CS 321 points to language in the memoranda stating that "office space acquired after issuance of this memorandum must not be designed to exceed an office space design standard of 150 USP per person."  2025 Memo at 5; 2024 Memo at 3.  Yet that single sentence does not change the character of the memoranda.  Read in context, the purpose is to establish occupancy targets and internal monitoring standards, not to prescribe the procedures by which solicitations must be issued or awards made.  Individual phrases or sentences must be read in context.  *See, e.g., West Virginia v. Env't Prot. Agency*, 597 U.S. 697, 721 (2022) (quoting *Davis v. Michigan Dept. of Treasury*, 489 U.S. 803, 809 (1989) ("It is a fundamental canon of statutory interpretation that the words of the statute must be read in their context and with a view to their place in the overall statutory scheme."); Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* § 24, at 167 (2012) ("[T]he whole-text canon . . . calls on the judicial interpreter to consider the entire text, in view of its structure and of the physical and logical relation of its many parts.").

The 2025 Memo states its goal is "the efficient use of taxpayer money," in service of which the memo "lays out standardized technologies, approaches, and methodologies for" collecting and

reporting occupancy data. 2025 Memo at 1. It is this internal "required reporting" which will "ensure compliance" with the directives of the Executive. *Id.* In context, then, the provision referring to acquiring office space suggests it is part of an internal monitoring and enforcement scheme, not an invitation for judicial review. *See* 2025 Memo at 4; *see also West Virginia*, 597 U.S. at 721.

The Federal Circuit's decision in *Cleveland Assets* confirms this point. There, the statute at issue limited GSA's ability to "lease space" above certain costs, providing that the agency "may not lease space to accommodate" certain uses if "the average rental cost of leasing the space will exceed $1,500,000." 40 U.S.C. § 3307(g)(1). Despite this language, the Circuit nevertheless held that section 3307 was not a procurement statute, but rather an appropriations measure that constrained agency authority without regulating the competitive process. *Cleveland Assets*, 883 F.3d at 1382. In coming to that decision, the Circuit examined the plain language reading of the statute and the statutory structure. *Id.* at 1381. Specifically, the Circuit reviewed the text of the statute, finding that while the term "procurement" was never used, the term "appropriation" was used eight times. *Id.* Further, the Circuit stated that the structure of section 3307 "directs GSA how to apply for an appropriation, but it says nothing of how GSA must run its procurement once the appropriation is made." *Id.* at 1382. The Circuit concluded that if it was "to read § 3307 as a procurement statute, every appropriations bill and rider would become a potential source of challenge for any interested party under 28 U.S.C. § 1491(b)(1)." *Id.*

The OMB memoranda work in this same fashion; their references to "acquired" office space identify the category of property subject to the new design standard, but they do not impose rules for conducting procurements. 2024 Memo at 1, 3; 2025 Memo at 5. Just as section 3307(g) in *Cleveland Assets* was examined and understood in the broader context of an appropriations

statute, the OMB memoranda must be understood in the context of portfolio management and utilization oversight. *Cleveland Assets*, 883 F.3d at 1382; 2025 Memo at 5 (aiming "[t]o accelerate portfolio-wide improvements to utilization."); 2024 Memo at 1 (describing the reporting requirements as a "significant shift in how agencies will manage their real property portfolios" which will "allow the Federal Government to identify opportunities to dispose and consolidate" space).

*    *    *    *    *

Accordingly, neither the OMB memos nor the USE IT Act qualify as a procurement authority under the test articulated in *Cleveland Assets*. As they do not regulate the procurement process, they cannot serve as the basis for CS 321's challenge to the RLP here.[16]

---

[16] The parties also debate whether a separate "zone-of-interests" inquiry applies. The zone-of-interests test is a longstanding principle of statutory interpretation that asks whether the plaintiff's interests are among those arguably protected or regulated by the statute they invoke. *See, e.g., Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 129 (2014) (explaining that the test is "not especially demanding," but excludes claims that are "so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress authorized that plaintiff to sue"). In the procurement context, the Government has occasionally argued that, even if a protestor is an "interested party" under § 1491(b)(1), its claims may still fail if the statute or regulation at issue was not enacted for the benefit of bidders or offerors. Some judges of this Court have accepted that view, while others have rejected it as inconsistent with the broad text of the Tucker Act, which authorizes review of "any alleged violation of statute or regulation in connection with a procurement." *Compare Cleveland Assets v. United States*, 132 Fed. Cl. 264, 277 (2017), *with MORI Assocs., Inc. v. United States*, 102 Fed. Cl. 503, 542 (2011), *and Air Borealis Ltd. P'ship v. United States*, 167 Fed. Cl. 370, 386–87 (2023). In *Cleveland Assets*, the Federal Circuit has declined to decide the issue. 883 F.3d at 1381.

Here, Defendant contends that the USE IT Act and OMB memos were intended to improve federal portfolio management, rather than confer enforceable rights on lessors, and that CS 321 therefore falls outside their zone of interests. Def. MJAR at 22–25. CS 321, in turn, argues that once it has shown it is an "interested party" under § 1491(b)(1), there is no need to conduct a separate zone-of-interests inquiry, particularly where the authorities it invokes reference "acquired" space and "federally leased space." Pl. Resp. at 13–14. As the Court resolves the case on the antecedent ground that these authorities are not procurement statutes or regulations, it need not decide here whether a zone-of-interests limitation applies in bid protests.

**B.    The USE IT Act and the OMB Memos Do Not Apply to this RLP.**

Even if the USE IT ACT and the OMB memos were procurement authorities, Defendant asserts that such authorities would still be inapplicable here because they apply only to the executive branch, and the FPD, as part of the judicial branch, "is not an executive agency whose office space requirements could fall within the scope" of the authorities. Def. MJAR at 25–26. Plaintiff contends that the authorities apply to FPD and, additionally, that GSA (an executive branch agency) is a lessee subject to the USE IT Act and OMB Memoranda. Pl. Resp. at 15–17. Plaintiff does not dispute that FPD is a part of the judicial branch. See Pl. Resp. at 7. Rather, it contends that FPD's status as a judicial branch component is "irrelevant" either because these procurement authorities still govern it, or because the procuring agency, GSA, is an executive agency. *Id*. As noted further below, the Court is not persuaded.

**1.    The USE IT Act**

Defendant argues that the USE IT Act does not reach this procurement because the Act defines "Federal agency" to mean the executive-branch entities covered by the Chief Financial Officers Act—a definition that excludes judicial branch entities such as FPD,[17] (though including GSA). USE IT Act § 2302(a)(6) (citing Chief Financial Officers Act of 1990, Pub. L. 101–576; 104 Stat. 2838). To that end, Defendant notes that the Act's operative duties run only to "Federal agenc[ies]," and as FPD is not included in that term, the statute supplies no constraint here. *See*

---

[17] This means that the FPD is an agency under the control of the judicial, rather than executive, branch of government. *See, e.g.,* https://www.fjc.gov/history/administration/court-officers-and-staff-federal-public-defenders ("Federal public defender offices are administered by the Administrative Office of the United States Courts, an agency within the judicial branch of government.") (last accessed September 29, 2025); https://www.uscourts.gov/administration-policies/judiciary-policies/guidelines-administering-cja-and-related-statutes-8 (last accessed September 29, 2025).

*e.g.*, USE IT Act § 2302(b), (c).

CS 321 disagrees that FPD's exclusion from the statutory definition of "Federal agency" ends the inquiry. It asserts the statute is not textually limited to executive agencies, but rather applies to "federally-leased space," and that this term extends coverage to the FPD's lease. Pl. Resp. 15 (citing Pub. L. 118-272 § 2302(c)–(d). In particular, the statute instructs that the OMB Director, in consultation with the GSA Administrator, "shall ensure" that utilization "in each public building and federally-leased space is not less than 60 percent." Pub. L. 118-272 § 2302(d)(1). Under CS 321's interpretation, the term "federally-leased space" means any space leased by the federal government, even if a judicial agency is the tenant.

The better reading is Defendant's. As the Supreme Court recently reminded lower courts, judges have "a 'duty to construe statutes, not isolated provisions.'. . . And the Court must read the words Congress enacted 'in their context and with a view to their place in the overall statutory scheme.'" *Turkiye Halk Bankasi A.S. v. United States*, 598 U.S. 264, 275 (2023) (first quoting *Graham Cnty. Soil & Water Conservation Dist. v. United States ex rel. Wilson*, 559 U.S. 280, 290 (2010), and then quoting *Davis v. Michigan Dep't of Treasury*, 489 U.S. 803, 809 (1989)). Reading the USE IT Act in context confirms that its applicability is limited to executive branch agencies.

Although Plaintiff contends that section 2302(d)(1)'s "shall ensure" directive, referenced above, is dispositive in its favor, such a phrase cannot be severed from the measurement and reporting provisions of sections 2302(b)–(c). *See Caraco Pharm. Lab'ys, Ltd. v. Novo Nordisk A/S*, 566 U.S. 399, 414 (2012*)* ("The meaning of the phrase [in the statute] turns on its context."). Those sections of the statute assign to "Federal agencies" the tasks of measuring occupancy data (e.g., through "badge swipe data" or "other technologies that the [GSA Administrator] determines to be

appropriate") and reporting building-level utilization.  Pub. L. 118-272 § 2302(b) (measuring utilization), (c) (reporting utilization).  Because "Federal agency" is limited to executive branch agencies, judicial agencies, such as FPD, are not required to measure or report occupancy data.  *See* § 2302(a)(6).  Section 2302(d)(1) directs that the OMB and GSA "shall ensure" building utilization "is not less than 60 percent" in any "federally-leased" space, and this sub-section does not expressly limit itself to "Federal agencies."  Yet, if this applied to non-"Federal agency" occupants, OMB and GSA would be charged with enforcing a 60 percent threshold for tenants who are not required to measure or report their utilization rate at all.  *See* § 2302(d)(1).  Instead, the structure indicates that section 2302(d) is the enforcement mechanism that applies after a "Federal agency" has completed the measurement and reporting requirements.  *See id.*  Because only executive-branch agencies that occupy a federal space must measure and report their utilization, application of the enforcement provision to non-executive agencies would run counter to the Act and upset its structure.

Additionally, the exception to the rule is informative of the rule's substance.  According to the Act, the OMB Director may waive utilization metrics when "a Federal agency demonstrates" that non-standard space is mission-necessary. § 2302(d)(5)(A).  This exception uses the defined term "Federal agency," which only covers executive branch agencies, and thus excludes judicial branch agencies, like FPD.  *Id*.  The exception to enforcement provided in section 2302(d)(5)(A) confirms the scope of the statute enforcement provision referring to "federally-leased space" — section 2302(d)(1).  Reading section 2302(d)(1) to bind the judiciary, for example, would impose the 60 percent mandate without any possibility for an exception, and without any indication in the Act that Congress intended to bind the Judiciary without any exception.  Thus, the statutory context confirms that § 2302(d)(1) applies only to a "Federal agency" within the meaning of the Act, which

does not include FPD.

CS 321 next contends that, even if the Act does not reach the judiciary as an occupant, GSA's own status as a "Federal agency" brings this lease within the statute.  Pl. Resp. 16–17.  The text and structure point the other way.  Begin with the Act's allocation of responsibilities.  The Act places the core obligations—measuring, reporting, and justifying space—on the tenant entity that occupies and operates in the space.  *See* USE IT Act § 2302(b)(2), (c)(1).  Indeed, section 2302(b)(2) directs "the heads of the Federal agencies" to work with GSA to "identify, deploy, and use" tools such as badge-swipe data "in public buildings and federally-leased space where the Federal agency occupies space" to measure occupancy.  USE IT Act § 2302(b)(2).  That statutory text clearly presumes the regulated actor is the tenant, not the lessor.  Reading "federal agency" to mean GSA whenever it leases for others would collapse the structure Congress adopted, because GSA does not occupy the premises and is not positioned to generate the occupant's utilization data.  The remedial provision confirms the point: if a "tenant agency" fails to meet the 60-percent target in section 2302(d)(1), "the [GSA] Administrator shall" reduce "the space of the tenant agency."  § 2302(d)(3).

Thus, examining the plain language of the statute, it is evident that GSA's status as an executive "federal agency" does not sweep judiciary-occupied space into section 2302(d)(1).  The statute regulates the use of the space if the tenant is an executive branch federal agency; GSA's procurement role does not change whom the statute regulates.  In sum, the USE It Act simply does not apply here to FPD, a judicial branch tenant.

### 2.    The OMB Memos

The parties' dispute over the OMB memoranda tracks their positions regarding the USE IT Act.  Defendant argues that the memoranda regulate "agencies" in their capacity as occupants and,

because FPD is not an executive-branch agency, the memoranda do not apply to this lease. Def. MJAR at 25–26. CS 321 asserts that (i) the memoranda contain broadly-phrased restrictions, most notably the 150-USF-per-person design standard, that should apply regardless of the tenant's identity, and (ii) GSA's role as procuring agency on behalf of the tenant, a judicial branch entity, is sufficient for the memoranda to apply. Pl. Resp at 15 ("[t]he OMB Memos plainly state that their restrictions on rental space apply to any Government effort to 'acquire' space"), 16 ("as the agency that has published the requirement and will eventually be the party to the Lease, GSA remains bound by its governing statutes and regulations"). The Court applies the same approach it used for the USE IT Act. For clarity, the Court discusses the 2025 memorandum; the 2024 memorandum is noted where separately relevant.

The 2025 memorandum defines "federal agency" by reference to 5 U.S.C. § 105, a definition that covers executive-branch entities and does not include the judiciary. 2025 Memo n.1. CS 321 nevertheless relies on the sentence in the memorandum that "office space acquired after issuance of this memorandum must not be designed to exceed 150 US[F] per person," to contend that such guidance is not confined to executive agencies. Pl. Resp. 15 (citing 2025 Memo at 5). That reading does not withstand the memorandum's context. First, the exceptions to that directive confirm its scope: one exception applies to "[l]eased office space that remains in an agency's portfolio under a succeeding or superseding lease agreement," a formulation that presupposes an executive-agency portfolio and would leave non-executive entities subject to the cap without access to the exception. *Id.* at 5. Second, the memorandum states that it "sets requirements for all executive agencies," indicating that the requirements do not extend to non-executive entities.[18] *Id.* at 1. Read in context, the 150-USF acquisition directive applies only to executive branch "federal agencies"

---

[18] The 2024 Memo makes this even clearer. It states that the Memo only "applies to each Federal agency" and specifically the section with the acquisition directive. 2024 Memo at 2.

as defined in the memorandum and therefore does not reach FPD, part of the judicial branch. CS 321 also contends that GSA's role as the leasing agency triggers the 150-USF-per-person limit even when the tenant is not an executive agency. *Id.* at 16. For reasons similar to the analysis of the USE IT Act's applicability, the memorandum's text and structure do not support CS 321's reading. First, the memorandum assigns ongoing duties to the occupying "agencies"—for example, to "continue to monitor occupancy data and report the data every two weeks thereafter, consistent with the agency's pay schedule." 2025 Memo at 5. Those directives presuppose the tenant as the regulated party: GSA does not "occupy" the premises and does not share the tenant's payroll cadence. Separately, the memorandum expressly acknowledges the distinction between GSA's role and that of tenant agencies: "[f]or spaces within GSA's custody and control, agencies should use an [Occupancy Agreement]" to report utilization. 2025 Memo at 4. That instruction recognizes GSA's role as procuring/landlord entity while confirming that the reporting obligation runs to the tenant "agency," not to GSA. *Id.* Reading "agency" to mean GSA whenever it leases for others would collapse that distinction and extend the design-standard cap to non-executive occupants the memorandum does not cover. Accordingly, the Court rejects CS 321's proposed theory.

\*    \*    \*    \*    \*

In sum, neither the USE IT Act nor the OMB memos apply to this procurement as FPD is part of the judicial branch and not subject to the requirements of these authorities.

### III. The RLP's Square Footage Requirements Are Not Unduly Restrictive.

Solicitations must be "designed to achieve full and open competition," and any restrictive requirement included in a solicitation is only permissible if it is necessary to meet the agency's legitimate needs. *Am. Safety Council, Inc. v. United States*, 122 Fed. Cl. 426, 435 (2015) (first quoting *CW Gov't Travel, Inc. v. United States*, 99 Fed. Cl. 666, 681 (2011), then citing 41 U.S.C. § 3306(a)(2)(B)). Thus, the question is whether the restrictions are necessary to meet the

Government's minimum needs. "[C]ompetitors do not dictate an agency's minimum needs, the agency does." *Savantage Fin. Servs. Inc. v. United States*, 595 F.3d 1282, 1286 (Fed. Cir. 2010) (internal citations omitted); *see also Second St. Holdings LLC v. United States*, 162 Fed. Cl. 306, 328 (2022); *Chugach Range and Facilities Servs. JV, LLC v. United States*, 174 Fed. Cl. 499, 510 (2024). "[D]etermining an agency's minimum needs is a matter within the broad discretion of agency officials" and "not for the court to second guess." *Id.* Accordingly, a protestor attacking a solicitation term as unduly restrictive bears a heavy burden to show the provision "is so plainly unjustified as to lack a rational basis." *Id.* at 1286–87; *Cleveland Assets*, 132 Fed. Cl. at 280, *aff'd*, 883 F.3d 1378 (Fed. Cir. 2018). Additionally, "'in the absence of clear evidence to the contrary,' the presumption of regularity allows courts to presume that 'public officers have properly discharged their official duties.'" *Cleveland Assets*, 883 F.3d at 1382 (quoting *Butler v. Principi*, 244 F.3d 1337, 1340 (Fed. Cir. 2001)).

CS 321 challenges both the overall square footage requirement of 57,588 USF square feet and many of the individual allocations that compose it, asserting that the agency demanded far more space than necessary.[19] Pl. MJAR at 31–39; *see* AR at 1054–1056. According to CS 321, Defendant set a floor nearly double the applicable benchmark and inflated the allocations for staff offices and support areas, thereby, in its view, excluding its building from competition. Pl. MJAR at 31–39.

The record, however, reflects a reasonable minimum square footage requirement. Despite projecting a 6 percent staffing increase, the agency reduced its overall space by roughly 15 percent—a sizable decrease amounting to about 22 percent less USF per person. AR at 388, 842.

---

[19] CS 321's offer was for 49,584 USF. AR at 1144. Thus, to succeed on this challenge, CS 321 would have to show that the RLP's minimum square footage requirement was unduly restrictive by about 8,000 USF.

Consolidating two separate offices into one location enabled efficiencies "in shared areas, such as lobbies, service areas, administrative spaces, training rooms, and conference rooms."[20]  AR at 1265.  Additionally, the decrease in space came from offices following "a smaller, standardized design compared to the current occupancy (at 321 E. 2nd Street location) with modular room sizes to allow for future adaptability."  *Id.*  Downsizing alone does not prove reasonableness, but here the combination of reduced space, increased staffing, and documented efficiency gains provides the coherent, mission-linked explanation that the rational-basis standard requires.  *See Savantage*, 595 F.3d at 1286–87.

CS 321 initially contends that the 57,588-USF minimum is unduly restrictive because it exceeds the 150-USF-per-person benchmark found in the USE IT Act and the OMB memos.  Pl. MJAR at 31.  However, as discussed above, those memos do not apply to this procurement and accordingly cannot show that the minimum square footage requirement was irrational.  Having failed to demonstrate that the overall square footage minimum is irrational, CS 321 turns to its component parts, contending that nearly every line item in the Federal Defender Work Chart

---

[20] This statement is attributed to the contracting officer's statement of facts to the GAO.  AR at 1265.  When an agency attempts to add to the administrative record with material prepared after the fact, courts must guard against post-hoc rationalizations—that is, "any rationale that departs from the rationale provided at the time the procuring agency made its decision."  *Raytheon Co. v. United States*, 121 Fed. Cl. 135, 158 (2015) (citing *CRAssociates, Inc. v. United States*, 95 Fed. Cl. 357, 377 (2010)), *aff'd*, 809 F.3d 590 (Fed. Cir. 2015).  Such belated justifications threaten "'the orderly functioning of the process of review'" and force "litigants and courts to chase a moving target."  *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 140 S. Ct. 1891, 1909 (2020) (quoting *Chenery*, 318 U.S. at 94).  Still, an agency may provide additional explanation of its decision-making so long as the explanation does not introduce new rationales but instead consists of "explanatory materials that do not offer new rationales for past decisions and that illuminate the methodology the agency employed in making its determination."  *D&S Consultants, Inc. v. United States*, 101 Fed. Cl. 23, 35 (2011) (citing *CRAssociates*, 95 Fed. Cl. at 376 n.15), *aff'd*, 484 F. App'x 558 (Fed. Cir. 2012); *see Regents*, 140 S. Ct. at 1908 (agency decision-maker's explanation on remand "limited to the agency's original reasons").  Such is the case with these statements made by the contracting officer during litigation, as they merely provide more context about a concept—efficiencies—that was already in the record.

inflates the agency's needs.  AR 1054–56.  None of these challenges carries its burden.[21]

### A.    Staff Office Spaces

#### 1.    150 NSF[22] per office

CS 321 argues that the requirement of 150 NSF per office is too great in light of the 150

USF benchmark.  Pl. MJAR at 32.  But since that benchmark does not apply, *see supra* at II.B, this

comparison does no work to illustrate why 150 NSF per office is a plainly unjustified requirement.

CS 321 also argues that the uniformity of 150 NSF for each type of staff member, when different

staff have different roles, does not represent any reasoned analysis.  *Id.*  However, the record re-

flects both variation where functions differ (e.g., legal secretaries are only reserved 75 NSF) and

a contemporaneous, mission-linked rationale for standardization ("smaller, standardized design …

with modular room sizes to allow for future adaptability") and thus the determination was squarely

---

[21] While it is the plaintiff's burden to demonstrate that a restrictive term had no rational basis, the agency must be able to demonstrate how it rationally reached its decision.  *Allied Tech. Grp., Inc. v. United States*, 649 F.3d 1320, 1327 (Fed. Cir. 2011) ("The plaintiff[] must show that [the deci-sion] lacked a rational basis"); *Wheatland Tube Co. v. United States*, 161 F.3d 1365, 1369–70 (Fed. Cir. 1998) ("[T]he agency's decisional path" must be "reasonably discernible").  Even when there is no statutory or regulatory requirement for agencies to document their determinations, the record "must be sufficient to permit meaningful judicial review consistent with the Administrative Procedure Act."  *Palantir USG, Inc. v. United States*, 904 F.3d 980, 994 (Fed. Cir. 2018).  Still, the agency does not have to provide a "written explanation of the rationale for each of the solici-tation requirements." *Savantage*, 595 F.3d at 1287.  It is sufficient for the rationale to be "apparent from, and supported by, the agency record." *Id.*  CS 321 does not make an affirmative argument in its MJAR that the record was insufficient to permit meaningful judicial review.  See Pl. MJAR at 31–39.  Instead, it makes numerous arguments about why it believes each requirement was unduly restrictive on its terms.  Even if it had advanced such an argument, the rationale for the requirements is "apparent" from the record.  *See Savantage*, 595 F.3d at 1287.

[22] The Federal Defender Work Chart in the RLP uses net square feet (NSF) not USF.  NSF is USF minus the circulation area.  However, when discussing individual line items, NSF and USF are equivalent (there is no circulation area of an office for example).  GSA adds in a 20 percent circu-lation area after adding up all the line items to get the total USF.  GSA, Circulation: Definition and Planning at 3 (available at: https://www.wbdg.org/FFC/DOD/UFC/600SERIES/RE-SOURCES/Circulation_-_Defining_and_Planning.pdf).

within the agency's "broad discretion . . . and is not for the court to second guess." *Savantage*, 595 F.3d at 1286; *see* AR 1054, 1265; *see also Parcel 49C Ltd. P'ship v. United States*, 130 Fed. Cl. 109, 126 (2016) (deferring to RLP's ceiling height requirement when administrative record exhibited "rational" justification).

### 2.    Alleged duplicative staffing / diminished future need for support staff

CS 321 contends that breaking up positions by unit (Traditional vs. Capital Habeas Unit) is "duplicative" and further argues that because of AI there will be less need for support staff and so the increase in staff the RLP envisions is unreasonable. Pl. MJAR at 33. However, these are attacks on staffing judgments, not space-planning logic. FPD has discretion to determine how many employees it requires and how to organize them, and consolidation was directed at shared areas, not headcount reductions. Nothing compels the Court to substitute its views on future staffing models. *See Savantage*, 595 F.3d at 1286; *Second St. Holdings*, 162 Fed. Cl. at 328 (rejecting protester's "self-serving speculation" that RLP space requirements would be insufficient for tenant agency's future needs).

### 3.    Support Spaces

### i.    Conference rooms (total 5,900 NSF)

CS 321 argues that huddle rooms duplicate private offices and that the mix of mid- and large-size rooms could be consolidated. Pl. MJAR at 34. The contracting officer explains that conference rooms are in high demand at existing locations and serve both internal needs and out-of-district proceedings. AR at 1267. Thus, Defendant states that utilization of the huddle rooms would alleviate scheduling conflicts for the conference rooms. *Id.* The GAO credited this rationale for the mixed-sized spaces and rejected a similar version of CS 321's claim. *See CS 321 E. 2nd Invs.*, 2025 WL 798776, at *3. This Court agrees. Even absent the contracting officer's

explanation, it is not unreasonable that a large law office requires significant conference room spaces. *See Savantage*, 595 F.3d at 1286; AR at 1055; *see also Chromalloy San Diego Corp. v. United States*, 145 Fed. Cl. 708, 734 (2019) ("When a protest concerns an agency's determination of its minimum needs, the 'agency's preferences are entitled to great weight'") (quoting *Savantage*, 595 F.3d at 1286).

### ii.    Mail room (1,500 NSF)

CS 321 asserts the mail room is duplicative of the copier bays and storage closets as it contains room for a printer and office supplies. Pl. MJAR at 34. But a mail room typically integrates intake, sorting, postage, and supply functions, often with dedicated equipment, and CS 321 identifies no basis showing that 1,500 NSF is an irrational requirement for a high-volume public defender office. Again, the Court's purview is only whether there is some rational basis for the requirement, not whether the Court would itself design an office the same way. *See Savantage*, 595 F.3d at 1286; AR at 1055 (describing the built-in counters and cabinets required for the mail room); *see also Chromalloy*, 145 Fed. Cl. at 734.

### iii.    Records, files, and "library" (2,970 NSF)

CS 321 contends physical records are obsolete and thus this space is not needed. Pl. MJAR at 35. The record, and GAO, recognize that this space principally houses paper files, including decades-old capital matters, that persist and continue to arrive in hard copy. *See* CS 321, 2025 WL 798776, at *4. It is apparent that physical records are not yet obsolete in the practice of law and it is accordingly reasonable that there be a space to store them. *See Savantage*, 595 F.3d at 1286; *Second St. Holdings*, 162 Fed. Cl. at 328.

### iv.    Forensic litigation/graphics workroom (450 NSF)

CS 321 deems the forensic litigation and graphics workroom duplicative of floor-level printer alcoves. Pl. MJAR at 35–36. However, it is apparent from the record that a graphics workroom performs unique functions to a simple floor-level printer. *See* AR at 1055 (describing the numerous supplies allocated for this room, such as two wall monitors). This allocation is not "plainly unjustified." *See Savantage*, 595 F.3d at 1286–87; *see also AirBoss Def. Grp., LLC v. United States*, 172 Fed. Cl. 219, 230 (2024) (courts should not "second guess" rational decisions about an agency's requirements).

### v.    Paralegal and investigator workrooms (600 NSF)

CS 321 argues paralegals and investigators already have offices and could use huddle rooms and thus do not need a workroom. Pl. MJAR at 35–36. However, the purpose of such rooms is apparent from the record: paralegals may conduct production tasks, such as assembling exhibits, which are better performed in a dedicated workroom. *See Savantage*, 595 F.3d at 1286–87; AR at 1055. Investigators may need to collaborate with interpreters or other investigators, and this Court cannot say it is per se unreasonable to do so in a dedicated workroom. *See Savantage*, 595 F.3d at 1286–87; AR at 2703-04; *see also Ames 1, LLC v. United States*, 162 Fed. Cl. 1, 24 (2022) (deferring to agency's familiarity with its own operations in procurement decision).

### vi.    Secured computer equipment/network room (900 NSF); IT work area (420 NSF); IT storage (1,000 NSF); Computer Forensics Work Room (300 NSF)

The allocations for these rooms are, on their face, reasonable. CS 321's objections largely amount to quibbles over square footage—whether the work area should be 300 instead of 420 NSF, or the storage closet "far smaller" than 1,000 NSF. Pl. MJAR at 36–37. However, disputes over tens or even hundreds of square feet are matters of line-drawing, not evidence of irrationality.

*See Savantage*, 595 F.3d at 1286–87; *see also Wit Assocs. v. United States*, 62 Fed. Cl. 657, 662 (2004) (upholding procurement requirements where they held "a rational relationship to agency needs" and were not "unduly restrictive").  On the present record, the IT suite is reasonably tied to the agency's operational needs.  *See* AR at 1056.

### vii.    Computer training rooms (1,500 NSF)

CS 321 argues that allocating 1,500 NSF for training ignores that employees train on the employees' in-office machines and that the RLP itself concedes that the two rooms could be reduced to one for both CHU and traditional staff.  Pl. MJAR at 37 (citing AR at 1056).  However, even if one room might have sufficed, eliminating it would reduce the overall minimum by less than 1,000 USF—an incremental change that would not enable CS 321 to be able to meet the reduced requirement.  *See Sys. Stud. & Simulation*, 22 F.4th at 998 (quoting *Bannum*, 404 F.3d at 1353) (holding that a protestor establishes prejudice by showing "that there was a 'substantial chance' it would have received the contract award but for" that error).

### viii.    Copiers and printers (total 1,350 NSF)

CS 321 argues that the space allocation for copiers and printers is "an obvious overinflation of space requirements" because four copy/printers do not require 75 NSF when each machine is less than 20 NSF.  Pl. MJAR at 38.  However, the space is not just for placing the printers but also provides space for staff to perform related tasks around the printers.  *See* AR at 1056 (providing a 0 NSF allotment for shredders, which are located in copy/printer spaces).  This allocation is not "plainly unjustified."  *See Savantage*, 595 F.3d at 1286–87; *see also Second St. Holdings*, 162 Fed. Cl. at 328.

### ix.    Other storage (450 NSF)

CS 321 argues that a storage closet for clients should not be the size of an office, and that the equivalent of two more offices should not be dedicated to furniture that FPD plans to dispose of. Pl. MJAR at 38. The record shows these areas serve ordinary purposes—client storage and staging of furniture or equipment pending disposal—and it is not plainly unreasonable for them to be 100 USF larger than CS 321 would prefer. *See Savantage*, 595 F.3d at 1286–87; AR at 1056; *see also DynCorp Int'l LLC v. United States*, 139 Fed. Cl. 481, 487 (2018) (deferring to "an agency's expertise in making procurement decisions").

### x.    Service units and breakrooms

CS 321 argues that the kitchenettes duplicate the breakrooms and that the 450-NSF size of each breakroom is excessive. Pl. MJAR at 39–40. However, the record distinguishes between the functions: kitchenettes serve as small service units for food preparation and storage, while breakrooms provide larger gathering areas. *See* AR at 1056. On this record, the mix of kitchenettes and breakrooms reflects a reasonable judgment about day-to-day operations rather than an undue restriction on competition, and so is not "plainly unjustified." *See Savantage*, 595 F.3d at 1286–87; *see also AirBoss Def. Grp.*, 172 Fed. Cl. at 230.

*            *            *            *            *

Viewed as a whole, CS 321's line-item challenges amount to disagreements with the agency's planning choices rather than proof that those choices lack a rational basis. *See Second St. Holdings*, 162 Fed. Cl. at 328. The record demonstrates that FPD sought to reduce its overall footprint while accommodating a growing staff by consolidating two locations into one and adopting standardized modules to increase efficiency and adaptability. *See* AR 388, 842, 1265. Against that backdrop, the allocations for offices, support spaces, and technology functions are coherently

explained and reasonably tied to the agency's operational needs.  While CS 321 would have drawn the lines differently, often by trimming a few hundred square feet here or there, such differences of opinion do not lead to the conclusion that the solicitation's requirements are "so plainly unjustified as to lack a rational basis."  *Savantage*, 595 F.3d at 1286–87.  The rationale is "apparent from, and supported by, the agency record" and, accordingly, CS 321's challenge fails.  *See id.* at 1287.

## IV.    CS 321 is Not Entitled to Injunctive Relief

The Court considers four factors when deciding whether to grant injunctive relief: (1) whether the plaintiff has succeeded on the merits, (2) whether the plaintiff will suffer irreparable harm if the court withholds injunctive relief, (3) whether the balance of hardships to the respective parties favors granting an injunction, and (4) whether the public interest is served by granting an injunction.  *Centech Grp., Inc. v. United States*, 554 F.3d 1029, 1037 (Fed. Cir. 2009).  The Court need not progress beyond the first factor because "[t]here can be no injunctive relief without a corresponding prevailing claim."  *Obsidian Sols. Grp., LLC v. United States*, 54 F.4th 1371, 1376 (Fed. Cir. 2022).  In other words, a "plaintiff who cannot demonstrate success upon the merits cannot prevail upon a motion for injunctive relief."  *Insight Pub. Sector, Inc. v. United States*, 161 Fed. Cl. 760, 817 (2022) (quoting *By Light Pro. IT Servs., Inc. v. United States*, 131 Fed. Cl. 358, 367 (2017)); *see also Dell Fed. Sys.*, 906 F.3d at 999 ("[P]roving success on the merits is a necessary element for a permanent injunction."); *Blue & Gold Fleet, L.P. v. United States*, 492 F.3d 1308, 1312 (Fed. Cir. 2007) (noting that success on the merits is "the most important factor required to enjoin the award of the contract").  As discussed above, CS 321's protest fails on the merits. Accordingly, CS 321 is not entitled to injunctive relief.

## <u>CONCLUSION</u>

Accordingly, for the reasons stated above, the Court **DENIES** CS 321's Motion for Judgment on the Administrative Record (ECF No. 16) and **GRANTS IN PART AND DENIES IN PART** the Defendant's Motion to Dismiss, or in the alternative Motion for Judgment on the Administrative Record (ECF No. 18).  The Clerk of Court is **DIRECTED** to enter Judgment accordingly.

The parties are directed to **CONFER** and **FILE** a Notice by **October 7, 2025**, attaching a proposed public version of this Sealed Memorandum and Order, with any competition-sensitive or otherwise protected information redacted.


IT IS SO ORDERED.




*Eleni M. Roumel*
ELENI M. ROUMEL
Judge


September 30, 2025
Washington, D.C.